FILED
CLERK, U.S. DISTRICT COURT

JUN 2 0 2018

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2018 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>IRINA SADOVSKY,<br>   aka "Irina Bekerman,"<br>YIGAL KEREN,<br>MIKHAIL KHANUKHOV,<br>SHAHRIAR KALANTARI,<br>   aka "Michael Kalantari,"<br>ANDREI SOTNIKOV,<br>NIDA ROSALES, and<br>JUAN CARLOS ENRIQUEZ,<br><br>       Defendants. | No. CR **18CR00375-AB**<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Health Care Fraud; 18 U.S.C. § 1347: Health Care Fraud; 18 U.S.C. § 2(b): Causing an Act to be Done; 18 U.S.C. § 371: Conspiracy to Engage in the Unlicensed Wholesale Distribution of Prescription Drugs; 21 U.S.C. §§ 331(t), 333(b)(1)(D), 353(e)(1)(A): Unlicensed Wholesale Distribution of Prescription Drugs; 18 U.S.C. § 371: Conspiracy to Pay and Receive Health Care Kickbacks; 42 U.S.C. §§ 1320a-7b(b)(1)(A), (2)(A): Payment and Receipt of Health Care Kickbacks; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(7) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.   Defendant IRINA SADOVSKY, also known as ("aka") "Irina Bekerman," a resident of Woodland Hills, California, owned, operated, and was the Pharmacist in Charge of Five Star RX d/b/a Five Star Pharmacy ("Five Star Pharmacy") and Ultimate Pharmacy, Inc. ("Ultimate Pharmacy") (collectively, "the Pharmacies"), which were located in Nos. 101 and 201, respectively, of 16438 Vanowen Street, Van Nuys, California, within the Central District of California.

2.   The Pharmacies serviced a patient population that received health care benefits through Medicare and/or Medicaid of California ("Medi-Cal").  Many of the Pharmacies' patients were obtained from facilities, including transitional housing centers, senior living residences, and board and care homes.

3.   From in or about January 2014 to in or about September 2017, Medicare reimbursed the Pharmacies approximately $44,546,313 for prescription claims.  During the same time period, Medi-Cal reimbursed the Pharmacies approximately $9,521,290 for prescription claims.

4.   Defendant YIGAL KEREN, a resident of Los Angeles, California, owned and operated transitional housing centers located in Los Angeles, California, within the Central District of California, under the business name Socially Oriented United Living, Inc.

5.   Defendant SHAHRIAR KALANTARI, aka "Michael Kalantari,"

2

a resident of Los Angeles, California, was a patient recruiter, or "marketer," who had access to the medication prescription pad for prescriber Y.K.

The Medicare Program

6. Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

7. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Each beneficiary was given a unique health insurance claim number.

8. Medicare programs covering different types of benefits were separated into different program "parts." Part D of Medicare (the "Medicare Part D Program") subsidized the costs of prescription drugs for Medicare beneficiaries in the United States. The Medicare Part D Program was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, and went into effect on January 1, 2006.

9. In order to receive Medicare Part D Program benefits, a beneficiary had to be enrolled in a Medicare drug plan. Medicare drug plans were operated by private companies approved by Medicare. Those companies were often referred to as drug plan "sponsors." A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

10.   A pharmacy could participate in the Medicare Part D program by entering into a retail network agreement directly with a drug plan; with one or more Pharmacy Benefit Managers ("PBMs"); or with a Pharmacy Services Administration Organization, which would, in turn, contract with PBMs on behalf of the pharmacy.  A PBM acted on behalf of one or more drug plans.   Through a plan's PBM, a pharmacy could join the drug plan's network.   When a Medicare Part D program beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim either directly to the drug plan or to a PBM that represented the beneficiary's Medicare drug plan.   The drug plan or PBM determined whether the pharmacy was entitled to payment for each claim and periodically paid the pharmacy for outstanding claims.   The drug plan's sponsor reimbursed the PBM for its payments to the pharmacy.

11.   A pharmacy could also submit claims to a Medicare drug plan to whose network the pharmacy did not belong.   Submission of such out-of-network claims was not common and often resulted in smaller payments to the pharmacy by the drug plan sponsor.

12.   Medicare, through CMS, compensated Medicare drug plan sponsors.   Medicare paid the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans.   Such payments were called capitation fees.   The capitation fee was adjusted periodically based on various factors, including the beneficiary's medical conditions.   In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, Medicare

1  reimbursed the sponsor for a portion of those additional
2  expenses.

3      13.   Medicare and Medicare drug plans (collectively,
4  "Medicare") were health care benefit programs, as defined by
5  Title 18, United States Code, Section 24(b).

6      The Medi-Cal Program

7      14.   Medi-Cal was a health care benefit program, affecting
8  commerce, that provided reimbursement for medically necessary
9  health care services to indigent individuals in California.
10  Funding for Medi-Cal was shared between the federal government
11  and the State of California.

12      15.   The California Department of Health Care Services,
13  ("DHCS") administered the Medi-Cal program.   DHCS authorized
14  provider participation, determined beneficiary eligibility,
15  issued Medi-Cal benefits identification cards to beneficiaries,
16  and promulgated regulations for the administration of the
17  program.

18      16.   Individuals who qualified for Medi-Cal benefits were
19  referred to as "beneficiaries."   Each beneficiary was given a
20  Medi-Cal benefits identification card with an identification
21  number.

22      17.   Medi-Cal reimbursed physicians and other health care
23  providers for medically necessary treatment and services
24  rendered to Medi-Cal beneficiaries.

25      18.   Health care providers, including pharmacies, could
26  receive direct reimbursement from Medi-Cal by applying to Medi-
27  Cal and receiving a Medi-Cal provider number.

28      19.   To obtain payment for services, an enrolled provider,

5

1  using its unique provider number, would submit claims to Medi-
2  Cal certifying that the information on the claim form was
3  truthful and accurate and that the services provided were
4  reasonable and necessary to the health of the Medi-Cal
5  beneficiary.

6      20.   Medi-Cal was a health care benefit program, as defined
7  by Title 18, United States Code, Section 24(b).

8      21.   The Pharmacies were Medi-Cal providers.  Defendant
9  SADOVSKY submitted a Medi-Cal provider application for Five Star
10 Pharmacy in or around November 2008, and for Ultimate Pharmacy
11 in or around June 2014.

B.  OBJECT OF THE CONSPIRACY

13     22.   Beginning in or around January 2017, and continuing
14 through in or around March 2017, in Los Angeles County, within
15 the Central District of California, and elsewhere, defendants
16 SADOVSKY, KEREN, and KALANTARI, together with others known and
17 unknown to the Grand Jury, knowingly combined, conspired, and
18 agreed with each other to commit health care fraud, in violation
19 of Title 18, United States Code, Section 1347.

C.  MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
    ACCOMPLISHED

22     23.   The object of the conspiracy was carried out, and was
23 to be carried out, in substance as follows:

24         a.   Defendant KEREN would obtain lists of beneficiary
25 names and information, including dates of birth, social security
26 numbers, and Medi-Cal identification numbers, from others known
27 and unknown to the Grand Jury, and would provide the lists to
28 defendants KALANTARI and SADOVSKY.

6

      b.   Defendant SADOVSKY would check the eligibility of the beneficiaries on the lists to determine whether Medi-Cal would reimburse claims for certain prescription drugs.

      c.   Defendants KALANTARI and SADOVSKY would write, and cause to be written, prescriptions for certain drugs, including HIV drugs Triumeq, Truvada, and Norvir, on the prescription pad to which defendant KALANTARI had access, in the names of beneficiaries on the lists.

      d.   Defendant SADOVSKY would order and cause to be ordered from prescription drug wholesalers the prescription drugs for which defendants SADOVSKY and KALANTARI had written on the prescriptions.

      e.   Defendant SADOVSKY would knowingly and willfully submit, and cause the submission of, claims to Medi-Cal and Medicare for these prescription drugs.  In so doing, defendant SADOVSKY would falsely represent and maintain the pretense that the Pharmacies had dispensed the prescription drugs to the beneficiaries, even though, as defendant SADOVSKY then well knew, the Pharmacies had not dispensed the prescription drugs to beneficiaries.

      f.   Defendant SADOVSKY would provide the bottles, obtained from wholesalers, of the prescription drugs for which she had submitted claims to Medi-Cal and Medicare to defendant KEREN with no patient labels adhered, so that defendant KEREN could sell the prescription drugs on the black market and defendants SADOVSKY and KEREN could share in the profits from those sales.

1    g. On or about March 21, 2017, defendant SADOVSKY

2 issued a check for $5,800 from Ultimate Pharmacy to Socially

3 Oriented United Living, Inc., defendant KEREN's company, which

4 defendant KEREN deposited, and paid $5,800 to defendant

5 KALANTARI in cash as compensation for the prescriptions

6 defendant KALANTARI wrote.

7    h. As the result of the submission to Medi-Cal and

8 Medicare of the false and fraudulent claims that defendants

9 SADOVSKY, KEREN, and KALANTARI submitted and caused to be

10 submitted, Medi-Cal and Medicare made payments to the Pharmacies

11 of at least approximately $115,147.

COUNTS TWO THROUGH FOUR

[18 U.S.C. §§ 1347, 2(b)]

24.   The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 21 and 23 of this Indictment as if set forth fully herein.

A.   THE SCHEME TO DEFRAUD

25.   Beginning in or around January 2017, and continuing through in or around March 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants SADOVSKY, KEREN, and KALANTARI, together with others known and unknown to the Grand Jury, knowingly, willfully, and with intent to defraud, executed and attempted to execute, a scheme and artifice: (a) to defraud health care benefit programs, namely, Medi-Cal and Medicare, as to material matters in connection with the delivery of, and payment for, health care benefits, items, and services; and (b) to obtain money from health care benefit programs, namely, Medi-Cal and Medicare, by means of materially false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of, and payment for health care benefits, items, and services.

B.   MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

26.   The fraudulent scheme operated, in substance, as described in paragraph 23 of this Indictment.

C.   EXECUTIONS OF THE FRAUDULENT SCHEME

27.   On or about the dates set forth below, within the Central District of California, and elsewhere, defendants SADOVSKY, KEREN, and KALANTARI, together with others known and unknown to the Grand Jury, knowingly and willfully executed and

attempted to execute the fraudulent scheme described above, by submitting, and causing to be submitted, to Medi-Cal and Medicare the following false and fraudulent claims for payment for the prescription drugs purportedly dispensed to the beneficiaries set forth below:

| COUNT | BENE-FICIARY | DRUGS | DATE CLAIMS SUBMITTED | AMOUNT CLAIMED | HEALTH CARE BENEFIT PROGRAM |
|-------|--------------|-------|-----------------------|----------------|------------------------------|
| TWO | V.G. | NORVIR CHLORPROMAZINE ATRIPLA LEVETIRACETAM ABILIFY FAMOTIDINE TRIZIVIR | 1/6/2017 | $8,555.83 | Medi-Cal |
| THREE | T.H. | NORVIR FLUPHENAZINE ATRIPLA OLANZAPINE TRUVADA | 1/6/2017 | $6,931.57 | Medi-Cal |
| FOUR | D.N. | TRIUMEQ NORVIR SUSTIVA NAPROXEN ROSUVASTATIN CALCIUM AMLODIPINE BESYLATE | 1/31/2017 | $4,122.97 | Medicare |

COUNT FIVE

[18 U.S.C. § 371]

28.   The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 5 of this Indictment as if set forth fully herein.

A.   INTRODUCTORY ALLEGATIONS

29.   At all times relevant to this Indictment, defendant MIKHAIL KHANUKHOV, a resident of Sherman Oaks, California, was the manager of the Pharmacies.

The Food, Drug, and Cosmetic Act

30.   The United States Food and Drug Administration ("FDA") was the federal agency responsible for protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"), Title 21, United States Code, Sections 301-399f, and other pertinent laws and regulations.

31.   One purpose of the FDCA was to ensure that drugs sold for use by humans were safe, effective, and bore labeling containing only true and accurate information.   The FDA's responsibilities under the FDCA included regulating the manufacture, labeling, and distribution of all drugs, including prescription drugs, and drug components shipped or received in interstate commerce.

32.   Under the FDCA, the term "drug" included articles that (a) were intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man; or (b) were intended to affect the structure or any function of the body of man.

33.   There were certain drugs intended for use by man which, because of their toxicity or other potentiality for harmful effect, or the method of their use, or the collateral measures necessary for their use, were not safe for use except under the supervision of a practitioner licensed by law to administer such drugs.   These drugs were known as prescription drugs.   For certain drugs, the application approved by the FDA limited those drugs to use under the professional supervision of a practitioner licensed by law to administer the drugs.   These drugs were also known as prescription drugs.

<u>Wholesale Distribution of Prescription Drugs</u>

34.   U.S. drug manufacturers generally distributed prescription drugs to pharmacies, hospitals, and customers through licensed wholesale distributors.

35.   Some drug distributors sometimes obtained drugs from unlicensed sources who sold drugs at prices significantly below the average wholesale price of the drug.   Those sources sometimes purchased counterfeit, stolen, or expired drugs that were previously dispensed and resold by the patient for whom the drug was prescribed and were reintroduced into the wholesale distribution chain.

36.   To prevent prescription drug diversion and the distribution of counterfeit, stolen, expired and substandard drugs, Congress enacted the Prescription Drug Marketing Act ("PDMA"), which was incorporated into the FDCA.

37.   Under the PDMA, persons engaged in the wholesale distribution of prescription drugs in interstate commerce in a State were required to be licensed by the State in accordance with guidelines established by the FDA.

38.   The FDCA prohibited the wholesale distribution or causing the wholesale distribution of a prescription drug without the required state license.

39.   Neither defendant SADOVSKY nor the Pharmacies were licensed as prescription drug wholesalers in the State of California.

B.   OBJECT OF THE CONSPIRACY

40.   Beginning no later than in or around September 2016, and continuing through in or around April 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants SADOVSKY, KEREN, KHANUKHOV, and KALANTARI, together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to engage in the unlicensed wholesale distribution of prescription drugs in interstate commerce, in violation of Title 21, United States Code, Section 331(t), 333(b)(1)(D), and 353(e)(1)(A).

C.   THE MANNER AND MEANS OF THE CONSPIRACY

41.   The object of the conspiracy was carried out, and to be carried out, in substance, as follows:

a.   Defendant KALANTARI and individuals known and unknown to the Grand Jury would write prescriptions for certain drugs for which there was demand on the black market, including HIV and psychiatric drugs, and would provide those prescriptions to the Pharmacies.

13

b.    Defendant SADOVSKY would submit and cause the submission of corresponding prescription claims to Medicare and Medi-Cal, and would order the prescription drugs from legitimate wholesalers, but would not dispense the prescription drugs to beneficiaries.

c.    Defendants SADOVSKY and KEREN would pay kickbacks, and cause the payment of kickbacks, to beneficiaries, marketers, prescribers, including defendant KALANTARI, and facilities in exchange for prescriptions for drugs that were prescribed to the beneficiaries and billed to Medicare and Medi-Cal, but not dispensed to beneficiaries, thereby creating an inventory of prescription drugs at the Pharmacies available for re-sale on the black market.

d.    Defendant SADOVSKY would provide unopened bottles of prescription drugs obtained from wholesalers to defendant KEREN and others known and unknown to the Grand Jury with no patient labels adhered to the bottles, or with patient labels partially adhered to the bottles to allow for easy removal.

e.    Defendants KEREN, KHANUKHOV, and others known and unknown to the Grand Jury, would sell and attempt to sell these wholesale bottles of prescription drugs to various outlets.

D.    OVERT ACTS

42.    In furtherance of the conspiracy, and to accomplish its object, defendants SADOVSKY, KEREN, KHANUKHOV, and KALANTARI, together with others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1: On or about September 20, 2016, defendant KHANUKHOV provided defendant KEREN with a list of prescription drugs that the Pharmacies had available for sale on the black market.

Overt Act No. 2: On or about October 31, 2016, defendant KHANUKHOV sent defendant KEREN a Russian-language text message that meant, "the merchandise and papers are ready."

Overt Act No. 3: On or about January 6, 2017, defendants KALANTARI and SADOVSKY wrote and caused to be written prescriptions for certain drugs on the prescription pad to which defendant KALANTARI had access.

Overt Act No. 4: On or about February 1, 2017, defendant SADOVSKY provided a box of prescription drugs to defendant KEREN.

Overt Act No. 5: On or about February 8, 2017, defendant SADOVSKY confirmed via a telephone call with defendant KEREN that the prescription drugs she had previously provided to defendant KEREN had been purchased from wholesaler Cardinal Health.

Overt Act No. 6: On or about February 8, 2017, defendant KEREN sold to an individual whom he believed to be a purchaser, but who was, in fact, a confidential source working with law enforcement (the "Purchaser"), the prescription drugs in the box obtained from defendant SADOVSKY.

Overt Act No. 7: On or about February 8, 2017, defendant KEREN paid defendant SADOVSKY a percentage of the money paid by the Purchaser in exchange for the prescription drugs that defendant KEREN had sold.

1    Overt Act No. 8: On or about March 17, 2017, defendant

2    SADOVSKY sent a text message to defendant KEREN stating that

3    defendant KALANTARI wanted to join their meeting with the

4    Purchaser.

5    Overt Act No. 9: On or about March 21, 2017, defendants

6    KEREN and SADOVSKY met the Purchaser of the prescription drugs.

7    Overt Act No. 10: On or about April 1, 2017, defendant

8    KEREN sent an email to the Purchaser titled "Inventory List,"

9    with a list of 19 prescription drug names, their cost and

10    quantity.

COUNT SIX

[21 U.S.C. §§ 331(t), 333(b)(1)(D), and 353(e)(1)(A)]

43. The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 4, 30 through 39, 41 and 42 of this Indictment as if set forth fully herein.

44. On or about February 8, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants SADOVSKY and KEREN knowingly engaged in, and caused others to engage in, the wholesale distribution in the State of California of prescription drugs in interstate commerce in a State without being licensed by that State to do so, namely, defendants SADOVSKY and KEREN engaged in and caused the wholesale distribution of prescription drugs Advair, Zetia, Creon, Abilify, and Nexium, when neither defendant SADOVSKY, defendant KEREN, nor the Pharmacies were licensed as prescription drug wholesalers in the State of California.

COUNT SEVEN

[18 U.S.C. § 1349]

45.    The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 4 and 6 through 21 of this Indictment as if set forth fully herein.

A.    OBJECT OF THE CONSPIRACY

46.    Beginning in or around August 2014, and continuing through in or around December 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendants SADOVSKY and KEREN, together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed with each other to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

B.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

47.    The object of the conspiracy was carried out, and was to be carried out, in substance as follows:

a.    Defendant KEREN and others known and unknown to the Grand Jury would pay kickbacks to marketers to bring beneficiaries and beneficiary information from facilities to prescriber B.T. in order to obtain prescriptions for certain drugs, including psychiatric drugs Seroquel, Abilify, and Latuda.

b.    Defendant SADOVSKY would check the eligibility of the beneficiaries to determine whether Medi-Cal and Medicare would reimburse claims for certain prescription drugs for these beneficiaries.

c.    Defendant SADOVSKY would order and cause to be

18

ordered from prescription drug wholesalers the prescription drugs that B.T. had prescribed.

d.   Defendant SADOVSKY would knowingly and willfully submit, and cause the submission of, claims to Medi-Cal and Medicare for the prescription drugs prescribed by B.T. In so doing, defendant SADOVSKY would falsely represent and maintain the pretense that the Pharmacies dispensed the prescription drugs to the beneficiaries, even though, as defendant SADOVSKY then well knew, the majority of these prescription drugs had not been dispensed to the beneficiaries.

e.   Defendant SADOVSKY would provide, and cause others to provide, the bottles of the prescription drugs obtained from wholesalers, for which she had submitted claims to Medi-Cal and Medicare, to defendant KEREN and others known and unknown to the Grand Jury with no patient labels adhered, or with the patient labels partially adhered, so that defendant KEREN and others known and unknown to the Grand Jury could sell the prescription drugs on the black market.

f.   As the result of the false and fraudulent claims that defendants SADOVSKY and KEREN submitted and caused to be submitted to Medi-Cal and Medicare, Medi-Cal and Medicare made payments to Five Star Pharmacy of at least approximately $1,067,231.

COUNT EIGHT

[18 U.S.C. §§ 1347, 2(b)]

48.   The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 4, 6 through 21, and 47 of this Indictment as if set forth fully herein.

A.   THE SCHEME TO DEFRAUD

49.   Beginning in or around August 2014, and continuing through in or around December 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendants SADOVSKY and KEREN, together with others known and unknown to the Grand Jury, knowingly, willfully, and with intent to defraud, executed and attempted to execute, a scheme and artifice: (a) to defraud health care benefit programs, namely, Medi-Cal and Medicare, as to material matters in connection with the delivery of, and payment for, health care benefits, items, and services; and (b) to obtain money from health care benefit programs, namely, Medi-Cal and Medicare, by means of materially false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of, and payment for health care benefits, items, and services.

B.   MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

50.   The fraudulent scheme operated, in substance, as described in paragraph 47 of this Indictment.

C.   EXECUTION OF THE FRAUDULENT SCHEME

51.   On or about the date set forth below, within the Central District of California, and elsewhere, defendants SADOVSKY and KEREN, together with others known and unknown to the Grand Jury, knowingly and willfully executed and attempted

to execute the fraudulent scheme described above, by submitting, and causing to be submitted, to Medicare the following false and fraudulent claim for payment for prescription drugs:

| BENEFICIARY | DRUG NAMES | DATE CLAIM SUBMITTED | AMOUNT CLAIMED |
|---|---|---|---|
| L.H. | ABILIFY LATUDA | 8/13/2014 | $1,833.94 |

COUNT NINE

[18 U.S.C. § 371]

52.   The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 3 and 6 through 21 of this Indictment as if set forth fully herein.

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

53.   Defendant ANDREI SOTNIKOV, a resident of Northridge, California, was a marketer.

54.   Defendant NIDA ROSALES, a resident of Bellflower, California, was a marketer who owned and operated NGR Pharmed-Health Consulting & Marketing Inc. ("NGR Pharmed").

55.   Defendant JUAN CARLOS ENRIQUEZ, a resident of Los Angeles, California, was a pharmacy technician at the Pharmacies, and was a marketer.

B.   OBJECTS OF THE CONSPIRACY

56.   Beginning no later than in or around January 2014, and continuing through in or around September 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants SADOVSKY, SOTNIKOV, ROSALES, and ENRIQUEZ, together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit the following offenses against the United States:

a.   Knowingly and willfully soliciting and receiving remuneration in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part

1   under a Federal health care program, in violation of Title 42,

2   United States Code, Section 1320a-7b(b)(1)(A); and

3          b.    Knowingly and willfully offering to pay and

4   paying any remuneration to any person to induce such person to

5   refer an individual to a person for the furnishing and arranging

6   for the furnishing of any item or service for which payment may

7   be made in whole or in part under a Federal health care program,

8   in violation of Title 42, United States Code, Section 1320a-

9   7b(b)(2)(A).

10  C.   THE MANNER AND MEANS OF THE CONSPIRACY

11         57.   The objects of the conspiracy were carried out, and to

12  be carried out, in substance, as follows:

13         a.    Defendants SOTNIKOV, ROSALES, and ENRIQUEZ would

14  develop relationships with the owners and operators of certain

15  facilities, whereby the owners and operators of the facilities

16  would send their beneficiaries' prescriptions to the Pharmacies,

17  for which prescriptions defendant SADOVSKY would submit claims

18  and cause claims to be submitted to Medicare and Medi-Cal.

19         b.    In exchange for the referral of beneficiaries

20  from facilities, defendant SADOVSKY would pay defendants

21  SOTNIKOV and ENRIQUEZ a kickback that was calculated as a

22  percentage of the profit the Pharmacies made from the

23  reimbursement from Medicare and Medi-Cal for the prescription

24  claims submitted for the beneficiaries at the respective

25  facilities referred by defendants SOTNIKOV and ENRIQUEZ.

26         c.    Defendant SADOVSKY would pay defendant ROSALES a

27  kickback of $40 per beneficiary per month in exchange for the

28

referral of beneficiaries from facilities with prescription claims.

        d.   In order to keep track of the kickback payments to defendants SOTNIKOV, ROSALES, and ENRIQUEZ, defendant SADOVSKY would maintain marketing files for each of defendants SOTNIKOV, ROSALES, and ENRIQUEZ, which contained calculations of the number of beneficiaries each marketer had referred from the facilities and the profit the Pharmacies made on the reimbursement for these beneficiaries' prescriptions from each facility.

## D.   OVERT ACTS

    58.  On or about the following dates, in furtherance of the conspiracy and to accomplish its objects, defendants SADOVSKY, SOTNIKOV, ROSALES, and ENRIQUEZ, and others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, within the Central District of California and elsewhere:

    Overt Act No. 1: On or about April 20, 2016, defendant SADOVSKY paid defendant ENRIQUEZ approximately $2,934 via check drawn on Five Pharmacy's Bank of the West account ending in -9113 payable to "Juan Carlos Enriquez."

    Overt Act No. 2: On or about October 18, 2016, defendant SADOVSKY paid defendant ROSALES approximately $3,640 via check drawn on Ultimate Pharmacy's JPMorgan Chase account ending in -1627 payable to "NGR Pharmed."

    Overt Act No. 3: On or about June 20, 2016, defendant SADOVSKY paid defendant SOTNIKOV approximately $1,167 via check

drawn on Five Star Pharmacy's Bank of the West account ending in -9113 payable to "Andrei Sotnikov."

COUNTS TEN THROUGH TWELVE

[42 U.S.C. § 1320a-7b(b)(1)(A)]

59.   The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 3, 6 through 21, 53 through 55, and 57 of this Indictment as if set forth fully herein.

60.   On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendants SOTNIKOV, ROSALES, and ENRIQUEZ, as set forth below, knowingly and willfully received remuneration, namely, checks in the amounts set forth below, drawn on the Pharmacies' bank accounts set forth below, which constituted kickbacks for referring patients to the Pharmacies for the furnishing and arranging for the furnishing of prescription drugs, for which payment could be made in whole and in part under a Federal health care program, namely, Medicare and Medi-Cal:

| COUNT | RECIPIENT | DATE | ACCOUNT | AMOUNT |
|-------|-----------|------|---------|--------|
| TEN | SOTNIKOV | June 20, 2016 | Bank of the West -9113 | $1,167.75 |
| ELEVEN | ROSALES | October 18, 2016 | JPMorgan Chase -1627 | $3,640 |
| TWELVE | ENRIQUEZ | April 20, 2016 | Bank of the West -9113 | $2,934 |

1     COUNTS THIRTEEN THROUGH SEVENTEEN

2   [42 U.S.C. § 1320a-7b(b)(2)(A); 18 U.S.C. § 2(b)]

3   61. The Grand Jury hereby repeats, re-alleges, and

4  incorporates by reference paragraphs 1 through 3, 6 through 21,

5  53 through 55, and 57 of this Indictment as if set forth fully

6  herein.

7   62. On or about the dates set forth below, in Los Angeles

8  County, within the Central District of California, and

9  elsewhere, defendant SADOVSKY knowingly and willfully paid and

10  caused to be paid remuneration: (a) to marketers, using checks

11  drawn on the Pharmacies' bank accounts, and (b) to

12  beneficiaries, using U.S. Bank rewards cards, in the amounts

13  identified below, which constituted kickbacks in exchange for

14  providing prescriptions to the Pharmacies for the furnishing and

15  arranging for the furnishing of prescription drugs, for which

16  payment could be made in whole and in part under a Federal

17  health care program, namely, Medicare and Medi-Cal:

| COUNT | RECIPIENT | DATE | ACCOUNT/CARD | AMOUNT |
|---|---|---|---|---|
| THIRTEEN | Sotnikov | June 20, 2016 | Bank of the West -9113 | $1,167.75 |
| FOURTEEN | Rosales | October 18, 2016 | JPMorgan Chase -1627 | $3,640 |
| FIFTEEN | Enriquez | April 20, 2016 | Bank of the West -9113 | $2,934 |
| SIXTEEN | Beneficiary Y.U. | October 2016 | U.S. Bank Reward Card | $25 |
| SEVENTEEN | Beneficiary I.G. | November 2016 | U.S. Bank Reward Card | $25 |

FORFEITURE ALLEGATION

[18 U.S.C. §§ 982(a)(7), 981(a)(1)(C); 28 U.S.C. § 2461(c)]

63.   Pursuant to Rule 32.2(a) Fed. R. Crim. P., notice is hereby given to defendants IRINA SADOVSKY, also known as ("aka") "Irina Bekerman," YIGAL KEREN, MIKHAIL KHANUKHOV, SHAHRIAR KALANTARI, aka "Michael Kalantari," ANDREI SOTNIKOV, NIDA ROSALES, and JUAN CARLOS ENRIQUEZ ("defendants") that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendants' conviction under any of Counts One through Seventeen of this Indictment.

64.   Defendants shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense set forth in any of Counts One through Seventeen of this Indictment; and

b.   A sum of money equal to the total value of the property described in subparagraph a. above.  For each of Counts One through Seventeen for which more than one defendant is found guilty, each such defendant shall be jointly and severally liable for the entire amount forfeited pursuant to that Count.

65.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), each defendant shall forfeit substitute property, up to the total

1  value of the property described in the preceding paragraph if,

2  as a result of any act or omission of a defendant, the property

3  described in the preceding paragraph, or any portion thereof:

4  (a) cannot be located upon the exercise of due diligence;

5  (b) has been transferred, sold to, or deposited with a third

6  party; (c) has been placed beyond the jurisdiction of the Court;

7  (d) has been substantially diminished in value; or (e) has been

8  commingled with other property that cannot be divided without

9  difficulty.

                              A TRUE BILL


                              _____/S/_____
                              Foreperson

NICOLA T. HANNA
United States Attorney


LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

STEPHEN A. CAZARES
Assistant United States Attorney
Deputy Chief, Major Frauds Section

ROBERT ZINK
Acting Principal Deputy Chief, Fraud Section
United States Department of Justice

DIIDRI ROBINSON
Assistant Chief, Fraud Section
United States Department of Justice

ALEXIS GREGORIAN
Trial Attorney, Fraud Section
United States Department of Justice